**AIKEN DRIVE–IN THEATRE CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

Civ. No. 1328.

United States District Court
W. D. North Carolina,
Charlotte Division.

Nov. 30, 1959.

484

Richard E. Thigpen, Robert L. Hines, Charlotte, N. C., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, David A. Wilson, Jr., Paul K. Kirkpatrick, Jr., Attys., Dept. of Justice, Washington, D. C., James M. Baley, Jr., U. S. Atty., Asheville, N. C., William J. Waggoner, Jr., Asst. U. S. Atty., Charlotte, N. C., for defendant.

WARLICK, District Judge.

This is an action to recover income and excess profits taxes paid by plaintiff in the sum of $6,310.05 for its fiscal year ending March 31, 1953. Plaintiff is a South Carolina corporation, organized in March 1952 to operate drive-in theatres, among other things, and operated the

Fox Drive-In Theatre, in the Aiken, South Carolina area. It began its operation in April, 1952. Its principal offices are at 120 South Poplar Street, Charlotte, North Carolina. It duly filed its income tax returns with the District Director at Greensboro, North Carolina, and for its fiscal year which ended March 31, 1953, paid tax of $9,866.90. Through the same medium and for plaintiff's fiscal year which ended March 31, 1955, it reported a net operating loss of $33,191.74.

Based on the allowance of deductions on the 1953 return of the 1955 net operating loss carry back, plaintiff received a refund of $8,468.12 for its fiscal year which ended March 31, 1953. Thereafter in February 1957, the District Director at Greensboro issued a report following an examination of plaintiff's tax returns for the fiscal years ending March 31, 1953, 1954, 1955, and 1956, in which report he disallowed the claimed abandonment loss of $25,639.18 and interest paid in the sum of $915, together with rent of $840 and a charitable contribution of $25, as claimed by plaintiff and assessed a deficiency of $6,310.05 for plaintiff's fiscal year which ended March 31, 1953. Thereupon plaintiff, using an overassessment of $2,630.14 for its March 31, 1954 fiscal year with interest, applied an additional sum of $4,363, and on September 4, 1957, paid the assessed deficiency in full. A claim for refund of the $6,310.05 was thereupon filed on September 20, 1957, and was formally rejected on December 10, 1957. This action was then instituted for the recovery.

Three questions arise and are presented in this controversy:

1. Whether or not the Commissioner of Internal Revenue acted arbitrarily and capriciously in determining that the taxpayer's and the Tower Drive-In Theatre Corporation's incomes were not properly reflected by their federal income tax returns for their respective fiscal years ended March 31, 1955, and September 30, 1954.

2. Whether or not the Commissioner of Internal Revenue acted capriciously and arbitrarily in allocating, pursuant to Section 482 of Internal Revenue Code of 1954, 26 U.S.C.A. § 482, certain deductions, reflected on the books of the taxpayer, back to the Tower Drive-In Theatre Corporation.

3. Whether or not the Commissioner of Internal Revenue acted arbitrarily and capriciously in determining that certain assets purportedly purchased by the taxpayer from the Tower Drive-In Theatre and shortly thereafter abandoned by the taxpayer were purchased at a price in excess of their fair market value.

The following statutes of the Internal Revenue Code of 1954 are applicable: Secs. 162(a) (3), 163(a), 165(a), 165(b), 1011 and 1012, 26 U.S.C. §§ 162(a) (3), 163(a), 165(a, b), 1011, 1012, together with Sec. 482. However, it would seem that Sec. 482 of the said Code is the only statute which applies to the facts in controversy, and is necessary to a decision. It is as follows:

"§ 482 Allocation of income and deductions among taxpayers.

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment. or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." 26 U.S.C. 1952 ed., Supp. II, Sec. 482.

Plaintiff is one of a large number of corporations controlled by the same interests with headquarters in the Western District of North Carolina at Charlotte.

Plaintiff is wholly owned by four stockholders, T. A. Little, J. H. White, Jr., F. H. Beddingfield and L. C. Fitzgerald. The three first named own 82½ shares

each and the last named stockholder owns 52½ shares for a total outstanding capital stock of 300 shares.

Plaintiff was originally organized to operate places of amusement in and near Aiken, South Carolina, to take care of the sudden influx of population coming about by the announced intention of the government to construct an Atomic Energy Plant at that place. During its peak construction it had in excess of 40,000 migratory workers engaged on such project. Other theatre operators had like ideas and different places of amusement including six or seven other outdoor theatres had sprung up in the Aiken area.

On October 7, 1952, plaintiff's four stockholders, along with three minority stockholders, who were local motion picture salesmen, organized the Tower Drive-In Theatre Corporation for the purpose of purchasing the Tower Drive-In Theatre. The purchase price was $35,000, and on completing the transaction it was taken over for operation. For some time it was successful like all public amusement places near Aiken, and certainly remained so as long as the plant was under construction. The influx of new money had a powerful effect upon the economy of the section. However, as the project neared completion and workers were being gradually released, business progressively became worse and by the first of the year 1954, the Tower Drive-In Theatre Corporation had begun to lose money. By June 1954 it was operating at most only approximately three days a week, and that operation at a decided loss. The losses began to be reflected first in February and continued without interruption until June 3, 1954, when the picture screen of Tower Drive-In Theatre was damaged by a storm. It is generally agreed that outdoor theatres enjoy their best business periods during the spring, summer and early fall months. However its owners made no effort to open and operate the theatre after the storm of June 3, though the damage was estimated to be no greater than $500.

In August 1954 plaintiff and the Tower Drive-In Theatre Corporation executed an agreement to buy and sell under the terms of which plaintiff purported to buy the Tower Theatre at the value on which the Tower Corporation carried the theatre on its accounting records. This in round figures was $30,500. This transaction was handled wholly by the four stockholders of plaintiff as the minority stockholders had delegated their rights. Later on closing the transaction they suffered losses on their capital investment in the final settlement which plaintiff's stockholders had avoided. And further by the terms of the agreement plaintiff agreed to pay to Tower the monthly rental that Tower was obligated to pay to the owner of the land on which the Drive-In Theatre was located. In effecting the purchase of Tower's property plaintiff's four shareholders borrowed $30,500 from the Union National Bank of Charlotte, on a note executed by the plaintiff, taxpayer, but personally endorsed by each of its four stockholders. Thereupon in following the mechanics of the transaction the proceeds of the note were transferred to the Tower Corporation and it in turn paid such sums to its shareholders. The net effect of this transaction was that $24,500 of the $30,500 loan to the plaintiff for which its four shareholders became personally liable ended up in the hands of these same persons as stockholders of Tower.

Tower thereupon was dissolved and plaintiff's books were then set up showing its ownership of the Tower property.

On October 14 and 15, 1954, Hurricane Hazel hit the South Carolina coast and the storm, having some appreciable effect in the Aiken area, virtually demolished the screen tower and damaged the marquee and a pump and motor of the Tower Theatre property. Plaintiff made no effort to repair this damage and in March, 1955, decided to abandon the Tower property—sold some of the concession and projection equipment, a cash register, and a few other minor assets, and then abandoned the whole of the remainder—notified the lessor of its

abandonment of the property, and undertook then to record its losses and reflect such on its books, and on its 1955 federal income tax return deducted as an abandonment loss the remainder of its investment in Tower.

### Contentions.

Plaintiff claims the deductions which resulted in its operating loss for the fiscal year ending March 31, 1955, were authorized under the authority of the Internal Revenue statutes. Secs. 162(a) (3), 163(a), 165(a), 165(b), 1011 and 1012.

The defendant contends that the Commissioner had such authority under Sec. 482 of the Internal Revenue Code to determine that the accounting records of the plaintiff and the Tower Drive-In Theatre Corporation, both in the control of the same interests, did not properly reflect the transfer by Tower of its assets to the plaintiff and a loss by the taxpayer on those assets.

It seems that the only issue of fact involved is whether or not the assets purchased by plaintiff and transferred to it were worth $30,500.

After a complete examination of all the factors involved, the Commissioner determined that the assets did not have such fair market value, and accordingly levied the assessment.

When one studies the mathematics of this transaction and the effect that it has, it becomes a rather simple sort of thing. As an illustration, if the Tower Corporation had abandoned the assets and reflected the loss on its own tax return, no tax saving could have been effected, in that Tower had already sustained sufficient losses with which to recover all the taxes which it had ever paid. If Tower had taken the loss it would appear that the only tax incidence to the stockholders would have been their realization of capital losses on their stock and notes.

Mr. Beddingfield, one of the four stockholders of plaintiff, and its secretary and treasurer, and in full charge of its affairs, on being asked in his testimony whether he would have purchased the Tower Drive-In Theatre for $30,500, knowing its financial condition, stated unhesitatingly, in substance, that he would not have purchased it at all. It further appears that the property was not offered to any other prospective buyer, nor was it ever publicly advertised for sale.

Again the evidence shows that in May, 1954, about three months prior to the proposed sale, herein, plaintiff's secretary and treasurer wrote a letter to the Department indicating that Tower was operating on a part time basis and at a distinct loss in revenue and would likely cease to operate in about thirty days. Plaintiff's secretary and treasurer further admitted writing to the Department to the effect that Tower was experiencing a decided decline in patronage due to the completion of the project and that its officers were considering liquidation.

By Sec. 45 of the 1939 Code, 26 U.S.C. § 45, now Sec. 482 of the Code of 1954, Congress has conferred authority upon the Commissioner to allocate deductions if he determines that such allocation is necessary. This is a broad discretion, limited only in that the necessity must arise in order to prevent evasion of taxes or, clearly to reflect the income. G.U.R. Co. v. Commissioner, 7 Cir., 1941, 117 F.2d 187; National Securities Corporation v. Commissioner of Internal Revenue, 3 Cir., 137 F.2d 600. This statute enables the taxing authorities to look behind the accounting entries of two or more business enterprises that are commonly controlled, and to rearrange for tax purposes, the income statements of such commonly controlled business enterprises, in order to correctly reflect their incomes. Grenada Industries v. C. I. R., 5 Cir., 202 F.2d 873.

On a careful examination of the facts in this case it clearly appears that the transaction was predicated wholly upon an undertaking to recoup a loss sustained, through a tax recovery. The more one analyzes the situation the more he becomes impressed with that fact;

and such examination of all the facts convinces me that the determination of the Commissioner was neither arbitrary nor capricious.

Judgment for the defendant is granted.

Submit decree.